IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID CORDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 10 CV 7516 |
| v. | ) | |
| | ) | Magistrate Judge Michael T. Mason |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Plaintiff, David Corder ("Corder" or "claimant"), seeks judicial review of the final

decision of the Commissioner of Social Security ("Commissioner") [*see* 26].  The

Commissioner denied Corder's claim for Supplemental Security Income ("SSI")

payments under section 1614(a)(3)(A) of the Social Security Act ("the Act"), 42 U.S.C. §

1382c(a)(3)(A).  The Commissioner has filed a motion for summary judgment [31]

asking that we uphold the decision of the Administrative Law Judge.  We have

jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  The

parties consented to proceed before us [8].  For the reasons set forth below, claimant's

request for summary judgment [see 26] is granted in part and denied in part, and the

Commissioner's motion [31] is denied.

**I.      BACKGROUND**

**A.      Procedural History**

On June 1, 1993, Corder applied for SSI and Disability Insurance Benefits ("DIB")

stating that he was disabled due to back problems, alcoholism, and asthma.  (R. 37-44.)

Corder later abandoned his DIB claim and pursued only his SSI claim.  (R. 374.)

After the initial denial of his applications and two unfavorable decisions by Administrative Law Judge ("ALJ") Alan J. Jonas, Corder filed a complaint in the Northern District of Illinois seeking judicial review.  (N.D. Ill. No. 00 C 2714 - Compl. [1].)  On May 4, 2001, Magistrate Judge Sydney I. Schenkier reversed ALJ Jonas's decision and remanded the matter for further proceedings to determine the extent of Corder's impairments, the extent to which those impairments limit his ability to work, and the work available to him given those limitations.  *Corder v. Halter*, No. 00 C 2714, 2001 WL 477210, at *13 (N.D. Ill. May 4, 2001).

Following that remand, ALJ Maren Dougherty found Corder not disabled.  (R. 461-79.)  ALJ Dougherty reached her decision after two administrative hearings where Corder, a medical expert, and a vocational expert testified.  (R. 482-529, 530-48.)  Corder then filed a second complaint in the Northern District of Illinois seeking judicial review on January 5, 2004.  (No. 03 C 9308 - Compl. [1].)  District Judge Suzanne B. Conlon ultimately reversed ALJ Dougherty's decision and remanded the case for further proceedings, including an assessment of Corder's non-exertional limitations with respect to his residual functional capacity ("RFC").  *Corder v. Barnhart*, No. 03 C 9308, 2004 WL 1381125 (N.D. Ill. May 10, 2004).

On April 8, 2005, Corder appeared for the second time before ALJ Dougherty.  (R. 869-909.)  On April 29, 2005, ALJ Dougherty again issued an unfavorable decision to Corder.  (R. 772-85.)  On July 13, 2005, Corder filed his third complaint in this District, seeking judicial review of that decision.  (No. 05 C 3893 - Compl. [1].)  The parties consented to the undersigned's jurisdiction [20, 21].  On July 19, 2007, we

reversed ALJ Dougherty's decision, finding she made an improper independent medical determination when evaluating the effect of Corder's subtest scores on his functional capacity. *Corder v. Barnhart*, 504 F. Supp. 2d 351, 359 (N.D. Ill. 2007). Further, after noting ALJ Dougherty's apparent commitment to denying Corder's claim, we urged the Social Security Administration to assign a new ALJ to the case on remand. (*Id.*)

On remand, ALJ Robert C. Asbille was assigned to Corder's case. (R. 913.) Pursuant to our order, ALJ Asbille resolved to consider Corder's non-exertional limitations with respect to his subtest scores achieved on the Wechsler Adult Intelligence Scale-Revised IQ test in assessment of Corder's RFC. (*Id.*) He held a hearing on January 28, 2010, at which Corder, Ellen Rozenfeld, Psy.D., a psychological expert, and Jill K. Radke, a vocational expert, each testified. (R. 1016-17.) ALJ Asbille also held a second, *in-camera* hearing on June 29, 2010, at which Corder's counsel and Radke were present. (R. 1049-64.) On August 23, 2010, ALJ Asbille issued his decision finding that Corder was not disabled and that, based on the testimony of the vocational expert, and considering Corder's age, education, work experience, and RFC, Corder was capable of finding work in significant numbers in the "national economy." (R. 927.) Corder did not file exceptions with the Appeals Council, rendering ALJ Asbille's decision the final decision of the Commissioner. 20 C.F.R. § 416.1484.

On November 22, 2010, Corder filed this action, his fourth complaint in this District, seeking judicial review of ALJ Asbille's denial of his application for SSI.

## B. Factual Background

### 1. Personal History

Corder was born in April 1958. (R. 37.) He completed the tenth grade and has

not had any further educational or vocational training.  (R. 248.)  He has not been

employed since 1986.  (R. 86.)  His work history includes working for a roofing company

from 1975-79, working as a service man at adult bookstores from 1979-82, and various

assembly line work at different factories from 1982-86.  (R. 86.)  That work involved

frequent to constant standing, walking, and bending.  (R. 86-91.)  Corder has a history

of alcohol dependency, but has been sober since April 1995.  (R. 112, 485.)

### 2.    Physical Health History

In 1987, Corder was diagnosed with paravertebral muscle spasm at L4-5 and

demonstrated a straight leg-raising test on the left of 65 degrees and on the right of 75

degrees.  (R. 210.)  In 1993, he was diagnosed with tender sacroiliac and spinal

disorder with chronicity.  (R. 203, 205.)  In 1998, he was diagnosed with symptomatic

degenerative arthritis of the lumbosacral spine and degenerative disc disease.  (R. 382.)

Corder was also diagnosed with asthma.  (R. 102, 381-82.)

### 3.    Mental Health History

In 1993 and again in 1997, Corder was examined by two different doctors who

both administered Wechsler Adult Intelligence Scale-Revised IQ tests, and both times,

Corder scored at the lower end of the borderline range of intellectual functioning.  (R.

159-75, 248-52.)  Michael Diamond, Ph.D, who tested Corder in 1993, also determined

Corder possessed below third grade reading and spelling skills, and fifth grade math

skills.  (R. 161.)  Additionally, Dr. Diamond found Corder had borderline scores in

assembly skills and eye-hand coordination tasks, as well as poor reasoning skills and a

limited vocabulary.  (*Id.*)  Mary Gardner, M.S. Ed., Psy. D., who examined Corder in

1997, reported that his information subtest score placed him in the mentally retarded

range.  (R. 250.)  She found him to be at a one percent reading level, lower than 99

percent of the populace.  (*Id.*)  She also noted Corder had memory problems and limited

abilities to remember locations and work-like procedures, and to concentrate.  (R. 263.)

### 4.    Hearing Testimony – Corder

At the January 28, 2010 hearing, ALJ Asbille briefly questioned Corder.  (R.

1019-22.)  Corder's counsel gave the caveat that Corder's memory had never been

good and had recently gotten worse since undergoing treatment for cancer in the

esophageal area.  (R. 1019.)  Corder testified that he had a driver's license, but had not

driven recently because of his current illness.  (R. 1021.)  ALJ Asbille asked Corder

about his educational background and why he dropped out of school during the third

year of high school.  (*Id.*)  Corder replied that he had difficulty balancing school and

work at the same time, so he dropped out to work.  (*Id.*)  The ALJ asked when and why

Corder stopped working, and while Corder had difficulty remembering the correct date,

he stated he stopped because he was fired due to his drinking problem.  (R. 1021-22.)

Corder also testified he was in special education classes in grammar school.  (R. 1023.)

### 5.    Hearing Testimony – Medical Expert

Dr. Rozenfeld, a psychological expert, was called to testify as to Corder's mental

RFC.  (R. 920.)  She based her testimony on the review of examinations conducted by

Drs. Diamond and Gardner in 1993 and 1997, respectively.  (R. 1024.)  She stated that

those doctors both concluded that Corder had borderline functional capacity and that an

individual with this limited capacity could "certainly handle obviously simple, routine

instructions as well as some more detailed instructions."  (R. 1027, 1029.)  ALJ Asbille

relied on the testimony of Dr. Rozenfeld to reach the conclusion that the claimant's

borderline intellectual functioning did not prevent him from performing semi-skilled

tasks.  (R. 920-22.)  In the pending appeal, Corder does not challenge the ALJ's

conclusion derived from Dr. Rozenfeld's testimony.

### 6.    Hearing Testimony – Vocational Expert

Jill Radke, a vocational expert ("Radke" or "VE"), testified regarding potential

available jobs.  In January 2010, during the first of two hearings before him, ALJ Asbille

asked the VE about jobs available for a hypothetical individual who was "capable of

performing light work, except that the claimant is not capable of lifting more than 20

pounds occasionally, and lifting more than 10 pounds frequently ... limited to

understanding, remembering, and carrying out work requiring simple instructions,

limited to simple, routine tasks, cannot sustain contact with the general public, in

particular in tasks that require handling customer complaints, and cannot tolerate

exposure to pulmonary irritants."  (R. 924, 1039-40.)  Radke testified that the jobs

available for such a person in the regional economy were: hand packer (roughly 11,000

positions), food preparation worker (roughly 3,800 positions), assembler (roughly 1,200

positions), and parking lot attendant (roughly 2,700 positions).  (R. 1040-41.)  The ALJ

and Corder's counsel both agreed to eliminate the parking lot attendant position based

on the sustained contact with the general public that position would require.  (R. 1041.)

During cross-examination, Radke provided the Dictionary of Occupational Titles

("DOT") codes for the hand packer, food prep worker, and assembler positions she

suggested.  (R. 1041.)  She also stated she obtained the number of available jobs for

each position from *Occupational Outlook Quarterly* ("the Publication").[1]  (R. 1044.)

Counsel asked to see a copy of the Publication, but she refused to provide it,

purportedly due to the "proprietary data" it contained.  (*Id.*)  Counsel objected and the

ALJ asked that the matter be briefed in order for him to rule.  (*Id.*)  When questioned by

the ALJ, the VE confirmed that she used the Publication as a supplement to the DOT

because the DOT does not provide numbers of jobs available.  (R. 1046.)  She stated

that, based on her professional judgment, the Publication provides the best available

data on job numbers in the same "family" as the DOT codes.  (R. 1047.)

In a written response to claimant's objections to two of the DOT codes the VE

used at the January hearing, on March 15, 2010, the VE wrote that the DOT had

assigned the food preparation worker job a number 7 for "Serving" in the "People"

category.[2]  (R. 1066.)  However, the VE went on to write that "this position is the second

lowest of a total of 8 interpersonal job demands.  Therefore, [Corder's] contact with the

general public is limited and superficial."  (*Id.*)  Additionally, the VE corrected what she

termed an "error" in her hearing testimony and provided a corrected DOT number for an

---

[1] At the January 2010 hearing, the VE testified she took the job numbers from *Occupational Outlook Quarterly* (R. 1045), which is published by the Bureau of Labor Statistics of the Department of Labor.  However, at the second hearing in June 2010, counsel and the VE referenced a different publication, entitled *Occupational Employment Quarterly*, which is published by U.S. Publishing Company, a private entity.  (R. 1054, 1057, 1059.)

[2] The VE referenced DOT code 311.472-010 for food prep worker, which is actually titled "Fast-Foods Worker" in the DOT.  In the "People" category, that job has a function assignment of "7 – Serving" with a "S – Significant" rating.  *Dictionary of Occupational Titles*, 311.472-010, 1991 WL 672682.  As explained at Appendix B to the DOT, "there are nine possible function assignments for the "People" category, and the numbering denotes, from highest (0) to lowest (8), the job's involvement with people.  *Dictionary of Occupational Titles*, App. B – Explanation of Data, People, & Things, 1991 WL 688701.  Function assignment 7, "Serving," is defined as "[a]ttending to the needs or requests of people or animals or the expressed or implicit wishes of people.  Immediate response is involved."  *Id.*

7

"unskilled Light Hand Packer" position. (*Id.*) Finally, the VE stated that the three

unskilled jobs she referenced had a reasoning level of 2, which she described as "the

second lowest of 6 worker functions in the interpersonal area." (*Id.*)[3] She noted that at

level 2, the DOT stated the worker had to have the ability to carry out "detailed but

uninvolved written or oral instructions," but that "in [her] professional experience, the

unskilled jobs listed do not require following detailed instructions." (*Id.*)

In June 2010, the ALJ held a second hearing, *in-camera*, at which he, the VE,

and Corder's counsel were present. (1049-64.) ALJ Asbille ruled that Corder had "wide

rights" to review the material relied upon by the VE during her earlier testimony, and

allowed counsel to review photocopies of the pertinent pages of the Publication and to

ask the VE "any additional questions that you like." (R. 1051.)

Counsel began by questioning the basis for the VE's testimony regarding the

number of available hand packer jobs where her March 15 written response actually

provided the DOT code for a cotton roll packer. (R. 1052.) The VE stated that she used

a light, unskilled DOT code "representative of a packer position," but could not provide a

specific number of cotton roll packer jobs available in the regional economy. (R. 1053.)

Instead, Radke testified that she had experience in the pharmaceutical industry, that

---

[3] The DOT defines six reasoning development levels, R1-R6. The DOT defines the three levels associated with light unskilled jobs as follows: R1: "Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job;" R2: "Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations;" and R3: "Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Dictionary of Occupational Titles,* 1991 WL 688702.

cotton roll packing positions were available a year before her current testimony, and that she could not give a current assessment of whether those jobs were still available. (*Id.*)

Counsel also questioned the VE as to the source of the Publication's skill and exertional levels for the jobs quoted. Radke testified that she did not know the formula or source for how the Publication derives its information about skill and exertional levels. (R. 1054-57.) She also testified that she could not break down the number of jobs she quoted by reasoning level based on the Publication. (R. 1057-58.) She noted that only the DOT provides reasoning levels for job codes, and since the DOT does not provide the number of jobs available for each of its categories, she could not provide such statistics for the job numbers she quoted. (*Id.*) Upon questioning by the ALJ, the VE stated that she found the Publication to be a reliable source for determining the number of jobs available for a specific DOT code, because they used Department of Labor and Census data in determining those numbers. (R. 1062.) However, she did not know the formula or exact methods used to reach job numbers or skill and exertional levels. (*Id.*)

In denying Corder benefits, ALJ Asbille held that, based on the VE's testimony and Corder's characteristics, Corder was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 927.)

## II.    LEGAL STANDARD

### A.    Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla of proof." *Kepple v. Massanari,* 268 F.3d 513, 516 (7th Cir. 2001). It means "evidence a

reasonable person would accept as adequate to support the decision." *Murphy v. Astrue,* 496 F.3d 630, 633 (7th Cir.2007); *see also Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation and quotations omitted). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple,* 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (citation omitted).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez,* 336 F.3d at 539 (citations omitted). While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz,* 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

### B.    Analysis Under the Social Security Act

To qualify for disability insurance benefits, a claimant must be "disabled" under

the Social Security Act (the "Act"). A person is disabled if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176.

The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter,* 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886; *see also* 20 C.F.R. § 416.960(c)(2) (discussing the Commissioner's burden at step five, stating "we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your [RFC] and vocational factors"). "A VE's testimony can satisfy [the step-five] burden only if that testimony is reliable. 'A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated.'" *Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) (*quoting Britton v. Astrue*, 521 F.3d 799, 803 (7th Cir. 2008)); *accord McKinnie v. Barnhart*, 368 F.3d 907, 910 (7th Cir. 2003) ("[A]n ALJ may depend

upon expert testimony only if the testimony is reliable.").

The central issue before us is whether or not ALJ Asbille erred at step five in relying on the vocational expert's testimony. ALJs often rely on the DOT and vocational experts to determine whether the Commissioner has met the step five burden. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011). The DOT is issued by the Department of Labor and provides typical characteristics of jobs that exist throughout the American economy. *Id.* The report lists jobs based on factors such as worker actions, exertional level, and skill requirements. *Id.* In fact, ALJs are obligated to take administrative notice of the DOT under Social Security Regulations. 20 C.F.R. § 404.1566(d)(1); 20 C.F.R. § 416.966(d)(1).

An ALJ, upon his discretion, may also employ a vocational expert to provide an impartial assessment of information provided in the DOT. 20 C.F.R. § 404.1566(e); *accord Weatherbee*, 649 F.3d at 569. However, "once an ALJ decides to rely on a VE's testimony, he must make sure that the testimony comports with the rules set forth in the Commissioner's Social Security rules." *Id.* Social Security Ruling ("SSR") 00-4p requires ALJs to ask whether a VE's testimony conflicts with information provided in the DOT before relying on the VE's testimony. SSR 00-4p, 2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000); *accord Weatherbee*, 649 F.3d at 569. If a conflict exists, the ALJ is required to resolve the discrepancies before relying on the VE's testimony. *Id.*

III.    **ANALYSIS**

A.    **ALJ Asbille's Decision**

In his August 23, 2010 opinion, ALJ Asbille found the following:

1.    Corder has not engaged in substantial gainful activity since May 24, 1993, the

12

application date.

2.      Corder has the following severe impairments: borderline intellectual functioning and alcoholism (in remission).

3.      Corder does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.      Corder has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b), except that he is not capable of lifting more than 20 pounds occasionally or more than 10 pounds frequently.  Additionally, he is limited to understanding, remembering, and carrying out work requiring simple instructions, limited to simple, routine tasks, cannot sustain contact with the general public, in particular where the contact involves tasks that require handling customer complaints, and cannot tolerate exposure to pulmonary irritants.

5.      Corder is unable to perform any past relevant work.

6.      Corder was born on April 10, 1958 and was 35 years old, which is defined as a younger individual age 18-49, on the date he filed his application.  Corder subsequently changed age category to closely approaching advanced age.

7.      Corder has a marginal education and is able to communicate in English.

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Corder is "not disabled," whether or not he has transferable job skills.

9.      Considering his age, education, work experience, and RFC, jobs exist in significant numbers in the "national economy" that Corder can perform.[4]

10.     Corder has not been under a disability, as defined in the Social Security Act, since May 24, 1993, the date his application was filed.

(R. 915-27.)

---

[4] The ALJ uses the term "national economy" in his opinion, which is a statutory phrase.  *See* 20 C.F.R. § 404.1566(a).  However, the Commissioner considers "that work exists in the 'national economy' when it exists in significant numbers either in the region where you live or in several other regions of the country."  *Id.*  Notably, the VE referenced the number of jobs available in the *regional* economy (*i.e.*, 1,200 assembler jobs, 11,000 hand packer jobs, and 3,800 food prep worker jobs) (R. 1040-41), and the ALJ relied upon that testimony in his opinion.  Thus, it appears he used the terms "national" as interchangeable with "regional." Ultimately, the parties do not contend – and thus we do not find – any error in that regard.

**B.     The ALJ's Decision at Step Five**

As noted above, the VE testified, and the ALJ found, that three categories of jobs were available to Corder.  Corder challenges that testimony and conclusion as follows:

**1.     Hand Packer**

The VE testified that 11,000 hand packer jobs were available in the regional economy.  (R. 1040.)  However, after Corder's counsel pointed out that the VE had provided a DOT number corresponding to a job with an exertional level the ALJ had already concluded was beyond Corder's capacity, the VE referenced the code for a cotton roll packer, which she termed an "unskilled hand packer."  (R. 1052-53.) However, when asked how many such jobs were available in Chicago, the VE responded that she could not provide a number, but could only say that, based on her past experience working in the pharmaceutical industry a year before her testimony, jobs had been available.  (R. 1053.)

Corder argues that the ALJ erred in relying on the VE's testimony regarding the number of hand/cotton roll packer jobs available where the VE could not articulate a particular number of such jobs available in the regional economy.  We agree.  "[I]f the basis of the VE's testimony is questioned at the hearing, 'then the ALJ should make an inquiry ... to find out whether the purported expert's conclusions are reliable.'" *Overman*, 546 F.3d at 465 (*quoting Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).  Here, the ALJ did not address, much less resolve, the issue of whether the VE had a reliable basis for her testimony regarding the number of cotton roll packer jobs available in the regional economy.  As a result, we conclude that testimony was not supported by substantial evidence, and thus the ALJ erred in relying upon it.  *See*

*Britton,* 521 F.3d at 803 ("A finding based on unreliable VE testimony is equivalent to a finding that is not supported by substantial evidence and must be vacated.").[5]

Additionally, Corder argues that the VE's testimony regarding hand packer jobs was inconsistent with the DOT, and that the ALJ erred by failing to resolve this discrepancy. Again, we agree. As noted above, the VE initially testified there were 11,000 hand packer jobs available in the regional economy that met the hypothetical profile given by the ALJ. (R. 1040.) She also testified that "cotton roll packer" was one in a group of 26 light unskilled DOT codes for hand packers. (R. 1057, 1060-61.) However, while the VE testified that unskilled jobs include reasoning levels ranging from R1 to R3**,** she did not know the specific reasoning levels of the particular hand packer jobs she referenced, nor did she know how many were classified as R1, R2, or R3 (R. 1055-58), thus again implicating the reliability issues discussed above. Further, when confronted with the fact that the ALJ's hypothetical involved restrictions to simple, routine tasks that would seem to eliminate jobs at the R2 level, and the fact that, according to the DOT, the cotton roll packer job required such a reasoning level (1991

---

[5] The Commissioner argues, without citation to any legal authority, that the VE's testimony regarding the number of cotton roll packer jobs available a year earlier is irrelevant because the period at issue is from 1992-2005 and her testimony occurred in 2010. Corder responds that, to his knowledge, there is no regulation or ruling requiring an ALJ to rely on anything but current job numbers. Moreover, Corder argues that the ALJ did not rely on this theory in the decision, so the Commissioner's argument is *post hoc* rationalization for the ALJ's conclusion. Like Corder, we are not familiar with any authority requiring a VE to use job data from the time period at issue in the case. *Cf. Henry v. Astrue,* No. 07 C 0957, 2008 WL 5330523, at *12 (S.D.N.Y. Dec. 17, 2008) (noting that the VE "relied on current data about jobs in the national and local economies which he adjusted to reflect an estimate of the number of jobs available during the relevant time of plaintiff's claimed disability.") Further, given that the ALJ did not rely on this argument in reaching his decision, we decline to endorse it here. *See Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011) ("[W]hat matters are the reasons articulated *by the ALJ,*" not the rationale advanced by the government on appeal) (emphasis in original).

WL 687936), the VE stated only that "in [her] professional opinion, the unskilled jobs do not require following detailed instructions."  (R. 1066.)

Despite the VE's acknowledgment of a conflict between her testimony and the DOT on this issue, the ALJ failed to address or resolve it.  That error also warrants reversal of the ALJ's decision.  SSR 00-4p, 2000 WL 1898704, at *4 (requiring ALJs to resolve alleged conflicts between the DOT and a VE's testimony before relying on the latter); *Overman*, 546 F.3d at 465 (reversing where ALJ unquestioningly relied on the VE's "bottom line" testimony, which was "determined to be in irreconcilable conflict with the DOT"); *Smith v. Astrue*, No. 09 C 2392, 2010 WL 3526655, at *17 (N.D. Ill. Sept. 1, 2010) (reversing where VE's challenged opinion testimony was "based solely on his experience" and ALJ failed to engage in further inquiry and investigation, noting that "[a]t a minimum, a vocational expert relying on personal experience, without any citation of objective reports or documents, must provide some specificity concerning the facts, figures, or other data that form the basis of his testimony"); *Boone v. Barnhart,* 353 F.3d 203, 206, 208-09 (3d Cir. 2003) (holding that VE's testimony did not by itself provide substantial evidence of claimant's ability to perform significant number of other jobs when it conflicted with the DOT and neither the VE nor the ALJ explained that conflict).

### 2.    Food Prep Worker

As noted above, the ALJ's hypothetical profile to the VE involved an individual who "cannot sustain contact with the general public, in particular in tasks that require handling customer complaints."  (R. 1040.)  However, the VE testified that jobs were available to Corder in the category of food prep worker (R.1040-41), which, according to the DOT, has a function assignment of 7 ("Serving") under the "People" category, with a

16

"S – Significant" rating. *Dictionary of Occupational Titles*, 311.472-010, 1991 WL 672682. The DOT's Appendix B further defines such an assignment as "[a]ttending to the needs or requests of people or animals or the expressed or implicit wishes of people. Immediate response is involved." 1991 WL 688701. While the VE recognized the DOT's definition, she disagreed with it, stating "[t]he DOT has assigned a number 7 for serving, however, this position is the second lowest of a total of 8 interpersonal job demands. Therefore, [Corder's] contact with the general public is limited and superficial." (R. 1066.)

We find that the VE's conclusion that Corder could perform jobs in the food prep worker category was contrary to the hypothetical posed by the ALJ as well as the People category function assignment of 7 afforded that category by the DOT. We also find that the ALJ failed to acknowledge or resolve this conflict. That failure warrants remand. As noted above, SSR 00-4p provides that "[n]either the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information." 2000 WL 1898704, at *4. In his decision, the ALJ noted only that according to the VE, Corder would have limited and superficial contact with the general public while performing a food prep worker job. But because the VE's testimony conflicts with the DOT's description of the serving component for that job, more is required. SSR 00-4p, 2000 WL 1898704, at *4; *Prochaska v. Barnhart*, 454 F.3d 731, 735-36 (7th Cir. 2006) (discussing an ALJ's unambiguous, affirmative duty to resolve conflicts between VE testimony and the DOT); *see also Overman*, 546 F.3d at 465 ("[I]f

17

the basis of the VE's testimony is questioned at the hearing, 'then the ALJ should make an inquiry ... to find out whether the purported expert's conclusions are reliable.'").

Corder also argues that the VE did not appear to consider his educational level and reading abilities when referencing the food prep worker job. In tests performed by Drs. Diamond and Gardner, Corder was found to have a third grade reading level and to read at a level lower than 99 percent of the population. (R. 161, 250). However, according to the DOT, the food prep worker job requires a reading level of 2, that is:

> Passive vocabulary of 5,000-6000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.

*Dictionary of Occupational Titles*, 311.472-010, 1991 WL 672682. When counsel questioned the VE about the DOT's reading requirements for the jobs she referenced, and how those requirements matched up against Corder's education and testing scores, the VE stated that she did not know the jobs' specific reading requirements. (R. 1043.)

We do not decide whether Corder's education and testing results automatically preclude him from meeting the requirements of a level 2 reading job. Indeed, Corder does not appear to argue as much. (*Cf.* Pl.'s Br. at 15 ("Testing showed that Plaintiff's reading level was lower than 99 percent of the population. Presumably this places him below level 2 according to the DOT...."); Pl.'s Reply at 8 ("Presumably a person who reads in at a lower level than 99 percent of the population would not be capable of meeting the reading requirements of level 2 on a scale of 6").) But the fact that the VE was unaware of the specific reading requirements for the jobs she proposed raises the possibility that she did not consider Corder's education, as required by the ALJ's

18

hypothetical. That in turn raises the questions of whether the VE's testimony was reliable and/or in conflict with the DOT. As a result, remand is warranted for the ALJ's consideration of these issues. *See, e.g.*, SSR 00-4p, 2000 WL 1898704, at *4; *Prochaska*, 454 F.3d at 735-36; *Overman*, 546 F.3d at 465.

### 3. Assembler

As with the food prep worker position, Corder argues it is unclear whether the VE's reliance on the assembler position failed to properly account for Corder's education and reading ability. Corder contends that his testing scores establish he is extremely limited in his ability to complete tasks associated with such a position. Again, we do not decide whether Corder's education and testing results preclude him from performing a job such as an assembler. However, the VE's apparent failure to consider the reading requirements for such a position again raises the concern that the VE's testimony lacked reliability and/or was in conflict with the DOT. For the reasons discussed above, remand is thus appropriate.

### C. The Publication

Corder argues that the ALJ inappropriately relied on the VE's testimony regarding the number of available jobs, based on the ALJ's erroneous assumption that the VE herself relied upon a government-recognized publication, the *Occupational Outlook Quarterly*. (R. 925.) However, Corder contends the VE testified at the second hearing that the numbers came from *Occupational Employment Quarterly*. (*See* R. 1054.) Corder asserts that the latter title is published by a private company, of which the Social Security Administration has not taken notice. Given the other aspects of our

19

decision, we need not resolve the parties' arguments on this issue.[6] However, on remand, in light of the discrepancy in the VE's testimony, we respectfully suggest that the ALJ clarify which publication was used, and whether its source impacts its reliability.

### D. Award of Benefits

Finally, Corder argues that, based on the ALJ's errors, this Court should grant reversal along with an award of benefits. Corder cites *Fischer v. Barnhart*, 256 F. Supp. 2d 901 (E.D. Wis. 2002), *Walberg v. Astrue*, No. 08 C 0956, 2009 WL 1763295 (W.D. Wash. June 18, 2009), and *Frey v. Bowen*, 816 F.2d 508 (10th Cir. 1987), as support. We regretfully acknowledge that Corder's claim has been pending for over 18 years, and commend his counsel's diligent representation. However, we disagree that an outright award of benefits is appropriate here. The cases Corder cites are not factually analogous. In *Fischer*, the ALJ had failed to address two prongs of the court's remand order and created two additional errors, and the Commissioner had failed in two prior attempts to fulfill the step five burden because, in applying the limitations imposed by the treating physician, whom the ALJ did not adequately discredit, the VE had stated that no jobs were available. *Fischer*, 256 F. Supp. 2d at 910-11. In *Walberg*, the ALJ failed, among other things, to pose a hypothetical that included all of the claimant's impairments, and when the limitations included those mentioned by the physician on whom the ALJ relied to find the absence of a Listing, the VE testified there were no jobs available. *Walberg*, 2009 WL 1763295, at *1. And in *Frey*, the court found, following

---

[6] *Cf.* 20 C.F.R. 416.966(D) ("When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental *and other publications*.") (emphasis added).

20

two administrative hearings and two reviews by the Appeals Council, as well as a prior court appeal, that the record had been fully and fairly developed, and that "[a] review of the record as a whole only supported the conclusion that Frey is disabled within the meaning of the Act and the Secretary's own regulations." *Frey*, 816 F.2d at 518.

Here, ALJ Asbille addressed our prior remand order. However, as discussed above, factual issues regarding the Commissioner's burden at step five remain and require resolution. As a result, this case is more akin to *Allord v. Astrue*, 631 F.3d 411 (7th Cir. 2011). There, the Seventh Circuit upheld the district court's remand for further proceedings regarding a claim that had been pending for nearly fifteen years. *Id.* at 418. The Seventh Circuit noted that "[a]n award of benefits is appropriate, however, only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the applicant qualifies for disability benefits." *Id.* Since factual issues remain to be resolved in Corder's case, an outright award of benefits is not appropriate at this time.

## IV.    CONCLUSION

For the foregoing reasons, Corder's request for summary judgment is granted in part and denied in part, and the Commissioner's motion for summary judgment is denied.  The case is remanded to the Social Security Administration for further proceedings consistent with this order.  It is so ordered.

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge

Dated: August 22, 2012